Are we ready? Everyone? You may proceed. Good morning. May it please the Court. My name is Jonathan Brush, and today with me is my co-counsel Amy Tucker, and we represent the appellant, the Galveston Independent School District. In my time before the Court today, I will demonstrate that both the State Hearing Officer and the District Court erred in holding and finding that the Galveston Independent School District violated its duty of child find under the Individuals with Disabilities Education Act. I will first address the error in the District Court's opinion and then proceed to the error in the Hearing Officer's opinion. We have also challenged the District Court's order affirming an award of attorney's fees to the family, but I intend to largely rely upon briefing unless the Court has specific questions about the attorney's fees. As the Court knows, this case comes to the Court from the review of an administrative record developed in a special education due process hearing. The District or the Hearing Officer found that the District violated its child find obligations under a continuing violation theory. On appeal to the District Court, the District Court affirmed the finding of a child find violation but upon a different theory. Specifically, the District Court found that the District was on notice as of October 2014 of Ashley's disability and need for special education services. The District Court then concluded that there was a five-month delay between that October triggering event when Ashley was hospitalized. I thought it said six months, but you're saying now five months? Between five and six, Your Honor. All right. And the District Court found or held that the District did not attempt to complete an evaluation until April of 2015. That was an erroneous factual finding, Your Honor. The District completed its evaluation in April, but it obtained consent. I just want to be clear. One of your complaints is that she's not a prevailing party. Yes, Your Honor. All right. But you're also complaining about the outcome. Yes, Your Honor. The one where she didn't win. Is that right? She didn't win, but you're complaining about it. So you're saying she shouldn't have lost. No, Your Honor. Not at all. All right. Ashley obtained a favorable finding on her behalf under child fine. The hearing proceeded to hearing primarily in an effort to obtain a residential placement at school district expense. In other words, the case was tried to the hearing officer attempting to get the school district to fund a residential placement at the Bay Center and force the school district to pay for that. Ashley lost on that issue. The hearing officer found that she was not entitled to residential placement at district expense, but nonetheless ruled for Ashley on the narrow issue of a child fine violation. We have a separate argument that that finding, that favorable finding to Ashley, was insufficient to render her a prevailing party for purposes of an award of attorney's fees. But as a predicate, Your Honor, if she doesn't even obtain that finding, if she's not… But then it's a loss for purposes of the argument that she's not entitled to attorney's fees. Is that right? I think I can get there either way. Yes, Your Honor. And I think the cleanest way to do it is show that there was no child fine violation at all. Because if the child fine violation is stripped away, then there's absolutely no basis for a prevailing party award of attorney's fees. The district court found and affirmed a child fine violation working on the—and I did the math, Your Honor. It is six months. Between October and April, found a six-month delay and found, citing this court's opinion in Woody v. Dallas Independent School District, or actually the district court's opinion in Woody v. Dallas Independent School District, that a delay of six months would be unreasonable. But the district court made a significant error in how it calculated the time frame. The district court looked from October to the date of completion of the special education evaluation. In doing that, the district court held the time period against the school district when the district was lawfully permitted to be conducting an evaluation. The regulations afford a school district 45 school days to complete an evaluation from consent and then an additional 30 days to conduct an admission review and dismissal committee meeting. The period of time that the district court should have looked at as a matter of this court's precedent and as a matter of regulation is let's assume that October triggering event. It should have been October to the February date of consent for an evaluation, which was February 16th. And, in fact, that would be the latest possible date of delay. February 16th is when the family signed a consent for the school district to conduct its evaluation. From February 16th to April, under this court's precedent in Dallas Independent School District v. Woody, the district can't be punished for taking the time that the law affords it to take to conduct an evaluation. The proper analytical focus for the district court and this court is from the October 2014 triggering event of hospitalization to at the latest the February 16th date of consent. But we're not just talking about a hospitalization. Are we also talking about an academic decline? Yes, Your Honor. Which had occurred prior to and up to October 2014. Is that right? Your Honor. There was an academic decline. There was a hospitalization. There were the incidents of theft. So the court just wasn't relying on hospitalization. Is that right? Your Honor, they're all bound together. The incidents of theft led to the hospitalization and the academic decline began after the return from hospitalization. And so really the triggering point that the district court focused on, the notice period the district court focused on was that October date. And using that October date, the district court essentially held that the district was unreasonable in its delay in requesting an evaluation or even beginning an evaluation because it waited until the February date. That's what it should have looked at is that February 16th date. But in reality, Your Honor, the date should be January. Because the record is clear that the school district's AIMS semester ended January 21st. And on January 6th, the school district sent a request for a 504 meeting to discuss what at that point had become clear was a decline in Ashley's grades. Up until that point, she hadn't gotten any final grades or any assessment of what credits she'd earned in her semester until January 21st. It was at January 21st when it became apparent to the district that Ashley was not progressing on the trajectory the district would have expected. She had not earned the three-and-a-half credits that they would have expected, but it in fact earned one-and-a-half credits. January 21st, the semester ends, grades come out. January 26th, the school district sends a letter to the family asking... No, Your Honor, but that's the time... It's actually a no to both, Your Honor. No, the district does have an awareness of how a student is progressing. Correct, Your Honor. But whether or not the student is going to have an inability to obtain credits or make passing grades does not necessarily become apparent until the end. And particularly in this case, where Ashley was at a unique school. She was at the Aims School, which is a self-paced school. And there's plenty of testimony in the record, Your Honor, from Ashley's teachers and also from the principal, Gene Fullen, that under that structure, under the self-paced structure, students frequently will have grades that appear to be failing mid-semester because they have only reached a certain point in their progress, but they are able to obtain passing grades by the end of the semester. And that's functionally different than a traditional... That was always my hope when I was in school, but that doesn't mean that the forecast didn't look bad. That's right. We can always be optimistic. But in this situation, because of the self-pacing nature and because, unlike a traditional school, where if she'd been behind, if she'd had an F in December, she likely would have gotten an F. Here, though, she would have had the time period from December to January to complete the course material and recover. So in the context of AIM, certainly it would be the end of the semester when the district would be aware that her struggles had culminated in her inability to earn the expected amount of credit. But in any event, the law allows a district to obtain information about a student. It permits them an opportunity to assess what the impact is going to be. So eligibility for the IDEA, the Individuals with Disabilities Education Act for Special Education Services, requires a qualifying disability and a present need for services. And one single event or even a decline in grades does not, in and of itself, indicate a need for present services. So going back to the timeline, the district sent a 504 request letter in January, January 26, inviting the parents to come meet to discuss what the district could do to help Ashley get back on track. But wasn't that after the parents requested a due process hearing? No, Your Honor. It was before? It was before. It was January 26. The parents didn't respond until they filed the due process request on February 9. So that time period of delay between the end of the semester and February 9 is directly attributable to the parents. The school district stood ready and willing to help. Now this court in Dallas Independent School District v. Woody held that a time period of three months between becoming aware of a need for special education services and commencing an evaluation, a time period of three months, is reasonable, particularly when some of the delay is attributable to the parents. That is essentially what we have here. We have October to November. The child's fine doesn't place any responsibility on the parents, does it? It does not, Your Honor. But if the school district is reaching out to the parents and saying, let's have this meeting, we need to meet to have this discussion, which could lead to a consent to evaluate and the parents refuse to meet or refuse to respond, that delay is attributable to them and cannot be charged to the school district. And that's what happened to you? That is what happened at least for a two- to three-week period, Your Honor. And so what we're left with from a triggering event of October to November, December, and January, you have a three-month period. Bearing in mind that's a three-month period with the November and December holidays, and under this Court's precedent, Woody, that's a reasonable amount of time. And tellingly, I think appellees know this because despite the fact that we briefed Woody, they don't even cite it to this Court. They spend a few sentences attempting to support the district court's decision because I think they know under Woody, I think they know that the district court made a mistake in calculating the time period, and I think they know that when you apply Woody, as this Court will, that they are going to lose on that issue. Mr. Brush, let me ask you just one, what I think is a complicating factor here, which is that the school district identified Ashley as in need of IDEA-type services several years ago and then apparently lost its records. And so when she comes back to school, she gets into the alternative program. For a year, she seems to be doing much better than she has since having declined. But is it irrelevant that the district knew that she had previously been eligible for IDEA services? So I think it's not irrelevant, Your Honor. I think there's a couple of things that impact the significance of that fact here, and that is the statute of limitations and also this Court's opinion in D.L. v. Clear Creek Independent School District. As the Court knows, the IDEA in Texas has a one-year statute of limitations. Ashley returned to Galveston around the summer of 2013. At that point, if we assume the veracity of some of the testimony in the record that she purportedly asked for some quantum of special education services and was instead given 504, that was her deadline to trigger a request for a due process hearing. She did not do that. Any claim related to the loss of the records or the failure when she re-enrolled to grant her special education would fall victim to that time bar. And, in fact, the hearing officer recognized as much when creating the continuing violation doctrine, which has no support in the text of the IDEA statute of limitations or in Texas' IDEA statute of limitations. Additionally, this Court's precedent is plain that just because a student has in the past received special education services does not entitle them to special education services if there is no present need. And so a good example of this is the D.L. case that was decided by this Court last summer. In D.L., the young man there had received special education services. He was successful, and the district, over the vociferous protest of his father, exited him from special education, citing his academic success, his social success, and that he was doing well. Because, in fact, if a student is doing well and no longer needs special education services, the case law encourages a school district to see and experiment with whether or not they can do without. And in D.L., the young man continued to do well until his senior year when, for a variety of reasons, his grades collapsed and he essentially dropped out of school. This Court held that the fear of failure, the parents' fear that he might fail in the future, was an insufficient basis to establish a present need for special education services. So the mere fact that she had been in special education before is not in and of itself determinative. It's a factor that goes into consideration. But in terms of the loss of the records, in terms of the re-enrollment, those claims are time-barred. And the continuing violation theory that the hearing officer relied upon essentially swallows the statute of limitations. And that's really problematic in the IDEA, where we're not talking about money. We're talking about education and access to services. So if a parent believes that their child needs special education in August of 2013, the IDEA's one-year statute of limitations in Texas compels for them to ask then not to sit on their rights until over a year later, a year and a half later. That's what happened here. Any claim related to the loss of records and the enrollment in GISD is time-barred. Thank you. Good morning, Your Honor. May it please the Court. I'm Andrew Cuddy, the attorney for the Krawitz family, specifically Ashley and her educational needs, joining you today from the snow belt of central New York, where we're getting away from the snow today, so I don't mind that. I want to suggest to the Court that Galveston's entire case rests on three false premises. However, after listening to their arguments here, I realize there's a fourth, the fourth being that any calculation of the delay to services to Ashley should be calculated from the date that the parent gave consent. Whether or not the parent is signing the district form for consent to evaluate is something that is entirely in the hands of the district. The three false premises that I want to address today initially were the first, that child find obligations are somehow triggered by some event. Child find is an ongoing obligation. It is not something triggered by a specific event. The second false premise that the district posits is that suggesting that it is an isolated event or some isolated fact that is what triggers child find, and that anything outside the statute of limitations should be ignored in the considerations of whether or not a child should be evaluated for special education purposes. Judge Hanks correctly recognized that the totality of facts and events here signaled to the district at the latest, he said conservatively, at the latest by October 2014. And that is on page 13 of his decision. The third false premise that the district posits is that the relief obtained by the parent for the student was de minimis. The district today must demonstrate to you that there was some clear error related to the facts or law. There was no clear error. This was not a close call that Judge Hanks and the hearing officer made in this case. The student, Ashley, had myriad disabilities. She had triple X syndrome. She had attention deficit disorder. She had post-traumatic stress disorder. She had developmental disabilities in reading, writing, and spelling. She had myriad behaviors that were manifestations of those disabilities, showing that she had both emotional, social, behavioral, and academic needs. The district is trying to spin this that the court should only be focused on Ashley's academic needs, but the IDEA requires focus on the management needs, the social-emotional needs, the behavioral needs, and the academic needs. Mr. Cuddy, how old was Ashley in the 2014-15 school year? She was 16, I believe, Your Honor. So she was basically age appropriate for the 10th grade, which she was in, right? She started in the 9th grade when she came back to Galveston, Your Honor, and she was not exactly on age level. She might have been one year behind, but okay. Just wanted to clarify that. Now, in regards to these disabilities that have been identified for Ashley, at all times they were known to the district. They had recognized these disabilities by putting her into a 504 plan, which was merely a Band-Aid, a plan of accommodation, rather than a plan of services to address her myriad needs. And the district was aware of these throughout the entire relevant period of time. Judge Hanks did not see this as a minor transgression. In fact, he called it a dereliction of duty. In my prior career as a Marine Corps officer, dereliction of duty would have you drummed out of the Corps. But in this environment, they're spending money to defend the dereliction of duty. We have the last point on the substantive stuff is their argument that the relief was de minimis. Why are we here if they're appealing a relief that was merely de minimis? It was not, in fact, de minimis. We had a trained hearing officer who was trained by the TEA to assess whether or not the child was getting a free and appropriate public education, and then designing a remedy to address that. That's exactly what happened here. There were ten specific points of relief that ordered the district to design a program for Ashley going forward so that her needs could be met, not just in academics. But you agree that the relief granted doesn't mirror the request for relief. You can't ask a parent, Your Honor, who is a layperson, to model in her hearing request the perfect remedy for her child. The parent takes what information she's able to gather from whatever experts she may be able to access with her limited means in order to formulate a remedy and ask for a remedy. And the IDEA does not require the parent to express the exact remedy. In fact, it only says that the parent must propose a solution to the extent known to the parent at the time. So that's a no, it doesn't, but it doesn't have to. You remember my question. Your question was the relief the parent got was different, right? Could you ask that again? I just asked whether or not the relief that she got mirrored her request, but you agree that it doesn't mirror the request. No, it does not mirror, Your Honor, but that's not the legal standard, and that's not the requirement on the parent when she initiates one of these hearings. She just has to propose a solution. And if you take the well-thought-out process of the IDEA, as soon as a parent initiates that hearing, the first thing that's going to occur is a resolution session where the district can sit down with all the parties and fix everything that's wrong or make an offer to fix everything wrong and cut the parent off on their attorney fees. They did not fix it, and they did not make such an offer. The last two points I want to make are on the attorney fees. There was a denial of fate at both levels of this process, and the parent obtained significant relief from the process that changed the legal relationship between the party. The district would have you create a new standard here today for the Fifth Circuit. That standard would be that the parent has to propose and the hearing officer or the court has to adopt the exact relief as the parent ordered it. That's not the standard here. It's not the standard anywhere. We had a trained hearing officer, trained in these educational issues, who ordered 10 specific points of relief. The parent certainly was a prevailing party in this matter. And lastly, in the analysis of the fee claim by Judge Hanks, he did exactly what the Fifth Circuit requires. He applied Lodestar, the rate times the reasonable rate times reasonable time. He analyzed the Johnson factors. He considered the degree of success obtained by the parent and applied an appropriate reduction for that. And the district has not argued any credible position that there was some abusive discretion by Judge Hanks in awarding these fees. Thank you, Your Honor. Thank you. Mr. Atwood. May it please the Court. Roy Atwood for the Council of Parents, Attorneys, and Advocates, amicus curiae in this case. During the five minutes ceded to me by the appellee, I intend to address the second issue that was raised by the appellant here, and that is the entitlement to attorney's fees under the IDEA. But before I do that, I simply have to address one issue. Kelsey Woody, the Woody case referred to by the school district, is my case. It's a case I argued in this courtroom, as a matter of fact, and it is not a child fine case. Child fine was not relevant to that case. It was analyzed to, it was analogous to the situation in that case, but on day one in that case, the school district was provided with a copy of an IEP. It was not of question whether the school district took too long to find the child, to analyze the child's situation in their educational environment. So, to the fee-shifting provision of the IDEA. Let me draw you back on that. I'm sorry to interrupt with your couple of minutes, but, you know, the district was giving Ashley accommodations under the Rehabilitation Act, and precisely what is the difference between what they were doing under the Rehabilitation Act and what they ended up doing under an IEP, after the request for, you know, all in a placement was rejected? Well, the remedy that was assigned by the hearing officer, while not the private placement originally requested in the due process hearing, contained, as counsel said earlier, ten elements. That is very inconsistent with what 504 provides. 504 doesn't provide any of the procedural safeguards that the IDEA provides to students who are in the special education program. It's a very different looking program for a student when a student's in, under an IEP, an individual education program under the IDEA, than it is to simply provide some accommodations to the student under 504. And, obviously, the 504 accommodations for this student weren't working, which is why her success, she was not having success in the school environment that she was in. Back to the fee-shifting provision. It is fundamental to the success of the congressional intent behind the IDEA. This court, in the Angela L. case in 1990, held that the fee-shifting provision in the IDEA is akin to a civil rights statute and should be analyzed under a civil rights statute. In McLean v. Lufkin Industries, this court in 2011 said that awards facilitate a plaintiff's access to the court to facilitate their rights by providing compensation sufficient to attract competent counsel. The need for competent counsel in this area in the IDEA could not be greater. According to the Texas Education Agency, last year there were 500,000 students receiving services in Texas under the IDEA. 700,000 students would be the number you would expect to find qualified for services if you apply the national average to the total enrollment of students in Texas. The problem is, out of the 87,000 licensed attorneys practicing in Texas, the TEA, the Texas Education Agency's list of attorneys who will represent parents, contains only 30 names. And of that 30, only approximately a dozen are actually taking cases. So you have a dozen lawyers in the state of Texas for 700,000 potential clients. Add to that fact that the TEA's own statistics show that 59% of the students in Texas are economically disadvantaged. And when you take all that together, it becomes very apparent, I think, why the fee-shifting provision in the IDEA is so important in order to attract competent counsel to vindicate a student's rights. Yet school districts routinely, as Galveston did here, attack any claims for attorneys' fees despite losing on the underlying claim. What Galveston does here is they confuse the claim, which is a claim for denial of a free, appropriate public education, with the remedy. The issue is was she successful in her claim, and she was. Your Honor, if the IDEA is allowed only... Counsel, you see your time has expired. Yes. I'll give you a moment to conclude. Thank you, sir. The IDEA is a hollow law if it's only available to students rich enough to fight the virtually unlimited resources of the school districts. We request that you uphold the decision of the district court. Thank you. Thank you. Rebuttal? Yes, Your Honor. A few brief points of rebuttal, Your Honor. First, counsel for the amicus pointed to the Woody case and attempted to distinguish it. What's remarkable about Woody is what amicus counsel just told us, is that the student tendered an IEP, asked for special education services, had been receiving special education services, yet the district, in that case, waited three months to begin the process of conducting an evaluation, and this court held that was a reasonable delay. This case, the facts are not similar to Woody in this regard, in that the parent did not tender an IEP. Well, you said the key difference is that Woody is not a child fine case. Your Honor, primarily... Is he right that he's not a child fine case? Primarily deals with fate, and, yes, he is in that respect. That's an insignificant difference. It's an insignificant difference in this regard, Your Honor, in that the court in Woody analyzed the reasonableness of the district's delay, which is precisely the issue presented in this case, which is why Woody is so important on this case, is if the delay of three months was reasonable under the facts and circumstances of Woody, it's reasonable here. Now, counsel for the appellees argued that under the standard of review, we're obligated to show a clear error in the facts. That's quite easy. In the district court's opinion, the district court faces its conclusion on the fact that, quote, GISD did not attempt to conduct an evaluation until April 2015. That's wrong. It's a matter of undisputed fact in the record that the evaluation was complete in April of 2015. The district began conducting its evaluation in February. That is a clear, factual error the district court made. We easily meet the standard of review on that point. That is error. And finally, with respect to appellee's point, the child fine does not simply focus on one fact. That can be correct. In this case, it does focus on one fact, and the one fact that's critical is the decline in the fall semester of 2014 because Ashley had been successful before that. So we had a situation where a student was successful, like in the D.L. case that this court issued last summer, and because the student was successful, there was not a present need for special education services. So under the facts of this case, we truly do have a triggering event that triggered anew a child fine obligation. While it's a continuing duty, how could the district have violated it under this court's decision in D.L. when Ashley was doing well and meeting every expectation in the school in terms of her grades? Now, counsel attempted to argue it's more than grades. Fair enough. Ashley was also doing well according to the testimony of her teachers during her freshman year at AIM in social skills as well. She was doing well. There was no present need for special education services. And so under the facts of this case, child fine does depend upon a single event, and that is why this case and the district court's analysis of this case. But I thought your contention in your brief was that the district court incorrectly relied on hospitalization as a single event that triggered. And that is a contention in our brief, yes, Your Honor. And in part, this goes to what I was discussing. And now you're saying the district court was incorrect in relying singularly on the academic record. No, Your Honor. That's not what you're saying? No, Your Honor. That's not what I'm intending to convey. All right. The district court is entitled to look at behavior and socialization in the school. Now, under the IDEA, outside of the school behavior, home problems, in most circumstances barring, I think, an autism diagnosis, which is not present here, that's not within the IDEA. But, yes, the district court and the problem with the district court's reliance on that single event of hospitalization. Which one single event are you talking about? The hospitalization. You've been talking about two single events. The hospitalization, Your Honor. All right. Well, the district court's reliance on the hospitalization is improper for the simple reason that a hospitalization standing alone tells us nothing about present need until we have... But you have a hospitalization and an academic record. Correct. And the incidence of theft. Correct, Your Honor. So when are you standing them alone? The hospitalization was the product of the incidence of theft. So using the hospitalization alone as a triggering event is improper because it fails to give the district an opportunity. But if it's used with the academic record, then it'd be proper. Correct. But where the district court went astray is it didn't give the school district the ability to assess the effects of the hospitalization and the medical change over a reasonable period of time. So if we just look to the hospitalization and say, hospitalization, you're on notice, that can't be the law because we never know what the effects of a hospitalization are going to be over time. That's why the IDEA contemplates allowing the district a reasonable amount of time and why this court's precedent contemplates allowing a reasonable amount of time to assess present need. Thank you, counsel.